**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| KRYOSPHERE, INC., | ) | 14-22080-jrs |
| | ) | |
| Debtor. | ) | |

**MOTION TO SELL SUBSTANTIALLY ALL OF DEBTOR'S ASSETS
FREE AND CLEAR OF CLAIMS, LIENS AND ENCUMBRANCES**

COMES NOW Debtor Kryosphere, Inc. and, pursuant to 11 U.S.C. § 363 and Federal

Rule of Bankruptcy Procedure 6004, hereby moves this Court for entry of an Order authorizing

the sale of substantially all of Debtor's assets free and clear of claims, liens and interests, as

more particularly set forth below. In support of this Motion, Debtor shows the Court the

following:

**BACKGROUND FACTS**

1.

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.

Debtor commenced this Chapter 11 bankruptcy case by filing a voluntary petition for

relief on September 2, 2014. Debtor is operating as a debtor in possession.

1263376.1

3.

Debtor operates a biorepository, which essentially is a cold storage facility for certain biological samples.  For a more detailed description of Debtor's operations, please see the Declaration of John O. Norton In Support Of First Day Motions (doc. 3).

**SECURED LENDER**

4.

Renasant Bank ("Renasant") claims a first position lien against substantially all of Debtor's assets, as reflected on Debtor's schedules, the Consent Order Authorizing Use of Cash Collateral by Debtor-In-Possession Pursuant To 11 U.S.C. § 363 And Providing Adequate Protection To Renasant Bank (doc. 30), and Claim No. 1.  Renasant also claims a lien against the assets of Debtor's affiliate, RPJ Leasing, LLC ("RPJ Leasing").  RPJ Leasing's assets are included in the assets to be sold.

5.

In communications with Debtor, Renasant has indicated that it does not object to this Motion.

6.

Debtor is not aware of any tax or other liens against the assets to be sold.

**SALES EFFORTS**

7.

Prior to filing its petition, Debtor discussed a sale of its assets, and RPJ Leasing's assets, with several prospective buyers.  Due to the unique nature of Debtor's business (Debtor is unaware of a similar business in the market) and Debtor's history of operating losses (Debtor lost

over $550,000 in 2013 and lost $240,000 from January 2014 through July 2014), the group of potential purchasers was relatively small.

8.

Debtor received two offers from two companies: one that is described below and another that offered less favorable terms. However, Debtor was unable to consummate either of these transactions due to the pending arbitration filed against it by Gilead Sciences, Inc.

**ASSET PURCHASE AGREEMENT TERMS AND SALE LOGISTICS**

9.

Debtor has received an offer to purchase substantially all of its assets, and RPJ Leasing's assets, as more particularly described in the Asset Purchase Agreement attached hereto as Exhibit A (the "APA").

10.

The essential terms of the proposed sale are as follows:

(a)  Purchaser: KryoCal, LLC, a North Carolina limited liability company ("Purchaser").

(b)  Property to be sold: all of Debtor's furniture, fixtures, equipment, supplies, contracts, customer lists, and substantially all other assets, excluding cash, deposits and accounts receivable as well as all of RPJ Leasing's equipment (the "Assets").

(c)  Leases and contracts to be assumed: Purchaser will provide a list of such leases and contracts within 15 days of the date of this Motion.

(d)  Price: $1,325,744.23 cash.

(e)  Due diligence: none.

(f)  Sale free and clear: sale of the Assets (excluding the RPJ Leasing Assets) will be free and clear of all claims, liens and encumbrances.

(g)  Bidding procedures: None; Debtor seeks approval of the APA "as is" without bidding procedures or break-up fees, but subject to denial of this Motion if a higher or better bid is received.

(h)  Closing: immediately after Court approval and expiration of any stay.

(i)  Renasant lien release: Renasant shall only release any lien it has against the Assets upon payment of net proceeds and shall retain all other rights.[1]  To the extent that net proceeds are not sufficient to satisfy Renasant's claim in this case, Renasant shall amend its claim to include the deficiency balance.

(j)  Closing costs:

    a.  No broker commission.

    b.  2014 personal property taxes will be prorated.

    c.  Debtor and Purchaser pay their own attorneys' fees.

11.

Debtor is very familiar with the market for the Assets and believes that the sale to Purchaser represents the highest and best offer for the Assets under existing conditions (e.g. the market of prospective purchasers is very small, and Debtor is operating on a negative cash flow basis).

12.

Debtor shall serve a hearing notice on all creditors and parties in interest providing that

---

[1] Renasant filed a secured claim in the amount of $1,305,180.90 (claim no. 1-1).  Renasant also claims a lien against the assets of RPJ Leasing in the approximate amount of $150,000.

any party that objects to the sale must object in advance of the hearing on this Motion.

## ARGUMENT AND CITATION OF AUTHORITY

### 13.

The proposed purchase price for the Assets is fair and significantly higher than any other offer Debtor has received. The APA has been negotiated at arms-length, and Purchaser is unrelated to Debtor.

### 14.

Approval of the APA and the sale contemplated therein is in the best interest of Debtor, the estate, and Debtor's creditors, as the sale will (i) greatly reduce the claims of Renasant, Debtor's largest creditor, (ii) result in remaining assets sufficient to pay all administrative claims in full and generate a modest dividend to unsecured creditors (based on estimated allowed claims), (iii) finally wind down Debtor's business after years of losses and (iv) result in the survival of an ongoing business enterprise that will service the various employees, independent contractors, and vendors with whom Debtor previously conducted business.

### 15.

Section 363 of the Bankruptcy Code permits this Court to authorize sales free and clear of liens, claims and interests, if any of five situations exist. Specifically,

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;
>
> (2)    such entity consents;

1263376.1

(3)     such interest is a lien and the price at which such property
        is to be sold is greater than the aggregate value of all liens
        on such property;

(4)     such interest in in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable
        proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

16.

Debtor understands that Renasant supports the sale of the Assets as proposed.  Therefore, the sale meets the requirements of Section 363(f)(2).

17.

Debtor requests that this Court enter an Order granting the relief sought in this Motion, and that such Order specifically provide as follows:

(a) Debtor may execute, deliver and fully perform under the APA, including executing such additional documents that may be reasonably necessary or desirable to implement the APA;

(b) Debtor may sell the Assets in accordance with the APA and free and clear of all liens, claims, encumbrances and interests, with all such liens, claims, encumbrances and interests released, terminated and discharged as to the Assets and with all such liens, claims, encumbrances and interests attaching to the proceeds of the sale of the Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Assets (excluding the RPJ Leasing Assets), with Renasant to receive all net proceeds.  At the request of Debtor or Purchaser, Renasant and any other holders of claims, encumbrances or interests with respect to the Assets

(excluding the RPJ Leasing Assets) shall execute and deliver satisfactions to Purchaser promptly after closing and payment in full of any secured claims.

(c) Upon the closing of the sale of the Assets, all persons holding liens, claims, encumbrances or interests of any kind as against Debtor or its property shall be restrained from asserting such liens, claims, encumbrances and interests against Purchaser or the Assets (excluding the RPJ Leasing Assets).

(d) The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not alter the net proceeds paid to Debtor or Renasant. By way of illustration, and without limitation, Debtor and Purchaser may agree to change the closing date or similar provisions without further order of the Court.

(e) The Order is enforceable upon entry, there is no just reason for delay in implementation of the Order, there is good cause for its immediate implementation, and that any the stay pursuant to Bankruptcy Rules 6004 and/or 6006 be waived, modified and not apply to the sale contemplated herein.

## CONCLUSION

18.

The sales price for the Assets is fair, Debtor obtained the offer through arms-length negotiations of unrelated parties after exposure of the Assets to the market, and the sale is in the best interest of creditors.  Debtor requests that this Court approve of the APA and authorize the sale contemplated therein.

WHEREFORE, Debtor respectfully moves this Court to:

(a)      hold a hearing on this Motion;

(b)      enter an Order granting this Motion; and

(c)      grant Debtor such other and further relief as may be equitable, proper and just.

Respectfully submitted this 3rd day of December, 2014.

**MARTIN BAGWELL LUKE, P.C.**


/s/ Jimmy C. Luke, II
Jimmy C. Luke, II
Georgia Bar No. 191817

400 Northridge Road, Suite 1225
Atlanta, Georgia 30350
Direct: (404) 467-5867
Facsimile: (678) 218-0396
Email: jluke@mbllawfirm.com
*Counsel for Debtor*

1263376.1

**EXHIBIT A**
**ASSET PURCHASE AGREEMENT**

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), is entered into and made effective as of December 3, 2014, by and among Kryosphere, Inc., a Georgia corporation ("Kryosphere"), RPJ Leasing, LLC, a Georgia limited liability company ("RPJ Leasing" and collectively with Kryosphere, "Seller"), and KryoCal, LLC, a North Carolina limited liability company ("Buyer").

## RECITALS

WHEREAS, Seller is in the business of custom biorepository services, cold-chain-of-custody logistics and management of clinical trial samples (collectively, the "Business"); and

WHEREAS, Seller wishes to sell to Buyer and Buyer desires to purchase from Seller certain assets of the Seller related to the Business upon the terms and conditions set forth herein and pursuant to an order of the Bankruptcy Court (as hereinafter defined) approving such sale under Section 363 of Chapter 11, Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"); et seq., (the "Sale Order"), such Sale Order to include the assumption and assignment of certain executory contracts as provided herein pursuant to Section 365 of the Bankruptcy Code.

NOW, THEREFORE, the parties to this Agreement, intending to be legally bound, in consideration of the mutual covenants contained herein (the sufficiency of which is hereby acknowledged by the parties), hereby agree as follows:

## AGREEMENT

1.    SALE OF ASSETS.

1.1    PURCHASE AND SALE.  Pursuant to the Sale Order of the Bankruptcy Court approving the same and subject to the terms and conditions contained herein, Seller hereby sells to Buyer and Buyer hereby purchases from Seller, substantially all of assets owned by Seller related to the Business as specifically described on Exhibit A to this Agreement (collectively, the "Assets").   Seller shall sell the Assets to Buyer free and clear of all encumbrances, liens or rights of any third party of any kind to the fullest extent permitted under 11 U.S.C. Section 363.  Seller represents and warrants to Buyer that it has provided a list of all assets of Seller to Buyer as of the date hereof, whether tangible or intangible, and that the parties have mutually agreed upon the assets listed on Exhibit A as the assets being transferred and sold to Buyer by Seller.  Seller acknowledges and agrees that any other assets of Seller not referenced on Exhibit A, including but not limited to, cash on hand, agreements, leases and licenses that are not Assumed Contracts (as defined in Exhibit A), and Seller's rights under this Agreement, (a) shall be defined as the "Excluded Assets," (b) shall not be sold to Buyer, and (c) that without limiting Section 1.3 below, Seller shall retain all responsibilities, obligations and liabilities related to the Excluded Assets.

1.2    COMPLETE TRANSFER.  Seller expressly acknowledges and agrees that the sale of the Assets under this Agreement constitutes a complete transfer of all of its rights, title and interest with respect to the Assets and that Seller reserves no rights to market or otherwise transfer the Assets.

1.3    ASSUMPTION OF LIABILITIES.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due, by Bankruptcy Court order, pursuant to Section 365 of the Bankruptcy Code, the liabilities and obligations arising after the Closing Date under the Assets, but only to the extent that such liabilities and obligations do not relate to any breach, default or violation by Seller on or prior the Closing Date (collectively, the "Assumed Liabilities").  Other than the assumed Liabilities, Buyer shall not assume any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, including, but not limited to, indebtedness, liabilities and obligations that are treated as indebtedness under generally accepted accounting principles, litigation, claims by shareholders or members, and breaches of pre-Closing obligations.  To the extent that the assignment of any

1

contract or any license, permit, approval or qualification issued or to be issued by any government or agency or instrumentality thereof relating to the Business, including, without limitation, any licenses and permits, to be assigned to Buyer pursuant to this Agreement shall require the consent of any other party, this Agreement shall not constitute a contract to assign the same if an attempted assignment would constitute a breach thereof. Seller shall use its best commercial efforts, and Buyer shall cooperate where appropriate, to obtain any consent necessary to any such assignment. If any such consent is not obtained, then Seller shall cooperate with Buyer at Buyer's expense in any reasonable arrangement requested by Buyer designed to provide to Buyer the benefits under any such contract, license, and permit.

1.4     EMPLOYEES.   As of the Closing Date, Buyer shall offer employment to the following employees/independent contractors of Seller:  Janice Jones, Ethan Bollee, Victoria Dixon, and Andrea Gaietto, upon terms deemed acceptable to Buyer.  Seller shall ensure that such employees accept such offers of employment with Buyer as of the Closing Date upon terms acceptable to Buyer (which shall include restrictive covenants), and acknowledges that such employees' collective willingness to enter into employment with Buyer is a critical factor related to Buyer's willingness to enter into the transactions contemplated by this Agreement.  Employment of such employees by Buyer after the Closing Date shall not be deemed a breach of any of such employee's restrictive covenants (or similar agreement, if any) with Seller or be deemed to be any act giving rise to liability of Buyer, and Seller waives any causes of action related to same.

1.5     DELIVERIES.  As of the Closing Date, Seller shall have provided to Buyer all of the following in a form satisfactory to Buyer and/or Buyer's legal counsel: good standing certificates, tax clearance letters, lien clearance letters, authorizing resolutions from the Seller's board of directors and managers, as applicable, and shareholders and members, as applicable (certified by an officer and manager, as applicable, of Seller), copies of all corporate governance documents (certificate of incorporation or organization, as applicable; bylaws or operating agreement, as applicable; shareholder agreements, etc.), any consents required by the transactions contemplated by this Agreement or any other documents requested by Buyer or Buyer's representatives or advisors.

2.     <u>PAYMENT</u>.

2.1     PURCHASE PRICE. The aggregate purchase price for the Assets shall be $1,325,744.33 (the "Purchase Price"), plus the assumption of the Assumed Liabilities.  Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds.  Seller represents and warrants to Buyer that the Purchase Price represents a fair market value for the Assets as of the date hereof.  The Purchase Price of the Assets may be allocated as mutually agreed by Buyer and Seller.

2.2     TAXES.  Seller shall be responsible for any and all sales, income or transaction taxes, if any, payable in connection with the sale of the Assets or the transactions and payments contemplated hereby.  Any personal property taxes related to the Assets for calendar year 2014 shall be prorated as of the day of closing.

2.3     BUYER CREDIT AND WITHDRAWAL OF CLAIM.  At closing, Buyer shall receive a credit against the Purchase Price in the amount of Buyer's post-petition, administrative expense claim.  Also at closing, Buyer shall withdraw any claim (general unsecured, administrative, or otherwise) it may have against Debtor in the Bankruptcy Case.

3.     <u>REPRESENTATIONS AND WARRANTIES OF SELLER</u>.

Seller represents and warrants to Buyer that each of the items set forth in this <u>Section 3</u> below are true and correct as of the date hereof and the Closing Date; **provided, however, that Buyer acknowledges that the representations and warranties below and elsewhere in this Agreement are subject to the provisions of Section 7.14 and Section 7.15 below**.

3.1     ASSETS. Seller has good and marketable title in and to all of the Assets, and the Assets are not subject to any mortgage, pledge, lien, lease, claim, encumbrance, charge, security interest, royalty obligations or

2

other interest or claim of any kind or nature whatsoever. Further there are no encumbrances on the intellectual property related Assets (including, without limitation, outstanding attachments related to legal fees). There are no material agreements or arrangements between Seller and any third party which are reasonably likely to have a material effect upon Seller's title to and other rights respecting the Assets. There are no material agreements or arrangements between Seller and any third party which limit Seller's ability to transfer all of the Assets to Buyer. Upon the Closing Date, Buyer shall not be subject to any limitations, obligations or restrictions with regard to the sale, license, distribution or other transfer or exploitation of the Assets. Seller owns all of the assets related to the Business and no assets of the Business are held by any subsidiary or affiliate of Seller. The tangible Assets are in good, working and operating condition. Seller has disclosed with specificity any defect related to any of tangible Asset to Buyer in writing.

3.2    CONFLICTING AGREEMENTS; CONSENTS. Neither the execution nor delivery by Seller of this Agreement nor compliance by Seller with the terms and provisions hereof will (a) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of,  any contract, any award of any arbitrator or any other agreement, any regulation, law, judgment, order or the like to which Seller is subject, or (b) result in the creation of any lien upon all or any of the Assets. Seller is not a party to, or otherwise subject to any provision contained in, any instrument evidencing indebtedness, any agreement relating thereto or any other contract or agreement  which restricts or otherwise limits the transfer of the Assets.  No consent, approval, permit, order, notification or authorization of, or any registration, declaration or filing with, any governmental entity or any third party is required in connection with the execution, delivery and performance by Seller of this Agreement or the consummation by Seller of the transactions contemplated by this Agreement.

3.3    LITIGATION.  Except as set forth in <u>Section 7.14 and Section 7.15</u>, no action, suit, proceeding or investigation is pending or threatened against Seller: (a) which questions the validity of this Agreement or the right of Seller to enter into this Agreement or seeks to prevent any of the transactions contemplated under this Agreement, (b) which is reasonably likely to have a material adverse effect on the Assets, or (c) which challenges the ownership or use, in any respect, of the Assets, all except with respect to the anticipated Bankruptcy Court filing of Seller. There is no judgment, decree, injunction, rule or order of any court, governmental department, commission agency, instrumentality or arbitrator or other similar ruling outstanding against Seller relating to the Assets or this transaction.  No action, suit, proceeding or investigation is pending or threatened by Seller against any third party relating to the Assets or the Business.  Notwithstanding the foregoing, Buyer acknowledges that, prior to Seller's bankruptcy case, Seller was involved in litigation with Gilead Sciences, Inc.  Buyer has made or will make its own inquiry into said litigation, and Seller makes no representation or warranty with respect to such litigation or its affect (if any) on the transactions contemplated herein.

3.4    COMPLIANCE WITH LAWS; LIABILITIES.   Seller is not in violation of any laws, material governmental orders, rules or regulations, whether federal, state or local, to which Seller or the Assets are subject. There is no liability or non-compliance with law arising prior to the Closing Date which may negatively impact the Assets or the Business on a go-forward basis.

3.5    FULL DISCLOSURE; DILIGENCE MATERIALS. This Agreement, any exhibit attached hereto, and all other documents delivered by Seller to Buyer or their attorneys or agents in connection herewith or therewith or with the transactions contemplated hereby or thereby, when taken as a whole, do not contain any untrue statement of a material fact nor omit to state a material fact necessary in order to make the statements contained herein or therein not misleading.  Seller covenants and agrees with Buyer that Seller has provided full, complete and accurate copies of all contracts, agreements, leases, etc. related to the Business to Seller and has procured the consent of any relevant parties that are parties to any such contracts, agreement or leases to the transactions contemplated herein.   To the extent any consent required pursuant to this Agreement has not been received by the Closing Date, without limiting any other remedies that Buyer may have under this Agreement or otherwise, Seller will use its best efforts after the Closing Date to ensure that Buyer fully enjoys the beneficial rights of Seller related to the item or Asset in which such consent has not been procured.  Seller has provided full, accurate and complete copies of the Seller's financial statements to Buyer, including, without limitation, a list of all accounts receivables and payables as of the Closing Date.  Seller has provided a full and complete list of the

Seller's key customers and vendors to Buyer.

3.6    AUTHORITY. Kryosphere is a Georgia corporation, duly organized, validly existing and in good standing under the laws of the State of Georgia and has all necessary power, authority and capacity to enter into this Agreement and carry out its obligations hereunder. RPJ Leasing is a Georgia limited liability company, duly organized, validly existing and in good standing under the laws of the State of Georgia and has all necessary power, authority and capacity to enter into this Agreement and carry out its obligations hereunder. Kryosphere is qualified to do business in North Carolina and any other place that Seller may be required to be qualified to do business. This Agreement has been duly executed and delivered by Seller and the signatory hereto has all requisite power and legal capacity to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution, delivery and performance by Seller of this Agreement has been authorized by proper corporate action. This Agreement, upon execution and delivery, will constitute the legal, valid and binding obligation of Seller, enforceable in accordance with its terms. Seller has not used any trade names or assumed names other than "Kryosphere."

3.7    ABSENCE OF CHANGE.  Intentionally omitted.

3.8    INTELLECTUAL PROPERTY; SOFTWARE.    Seller has provided Buyer a list of all patents, trademarks and service marks (whether or not registered), trade names, copyrights (whether or not registered), domain name registrations, and registrations or applications for registration of any of the aforementioned rights together with applicable registration and application numbers, owned by or registered in the name of Seller or in which it has any rights, licenses, etc. (collectively, with any other intellectual property used in the Business, the "Intellectual Property").  Seller has also provided Buyer a list of all licenses and other rights granted by Seller to any third party with respect to any of the Intellectual Property and licenses and other rights granted by any third party to Seller with respect to the Intellectual Property.  Seller owns and possesses all right, title and interest in and to, or has a valid license to use all of the Intellectual Property necessary for the operation of the Business as presently conducted and as currently contemplated, and (a) none of such Intellectual Property has been abandoned; (b) no allegation or claim, including proceeding, has been made by any third party contesting the validity, enforceability, use or ownership of any such Intellectual Property, and there is no reasonable basis for any such allegation or claim; (c) the Seller nor any registered agent of Seller has received any notices of, or has any knowledge of any reasonable basis for, an allegation of infringement or misappropriation by, or a conflict with, any third party with respect to the Intellectual Property; (d) the Seller nor any registered agent of Seller has any knowledge of any allegation or claim that the operation of the Business as previously or presently conducted infringes upon, misappropriates, or is in conflict with any intellectual property rights of any third party; (e) Seller has not infringed, misappropriated or otherwise violated any intellectual property rights of any third party; (f) no infringement, misappropriation or conflict will occur as a result of the continued operation of the Business as presently conducted by Seller and as currently contemplated, and (g) Seller has taken reasonable and customary measures and precautions necessary to protect and maintain the confidentiality of all trade secrets in which Seller has any right, title or interest and otherwise to maintain and protect all such trade secrets, including requiring all current and former employees, consultants and independent contractors of Seller to maintain the confidentiality of such trade secrets.  All employees and contractors of Seller have signed "work for hire", "hired-to-invent", "obligated to assign" (or like) agreements with Seller so that any intellectual property created by such employees or contractors prior to the Closing Date has vested with Seller (and is transferable to Buyer without the consent of any employee or third party).

Seller has provided Buyer a list of all computer software currently used by Seller or that is necessary for the operation of the Business as presently conducted by Seller and as currently contemplated (collectively, the "Software").  Seller owns and possesses all right, title and interest in and to, or have a valid license to use all of the Software.  No allegation or claim, including proceeding, has been made by any third party against Seller contesting the validity, enforceability, use or ownership of any such Software, and to the knowledge of Seller there is no reasonable basis for any such allegation or claim.  The Seller nor any registered agent of Seller, has received any notices of, or has any knowledge of any reasonable basis for an allegation of, any infringement or misappropriation by, or conflict with, any third party with respect to the Software.  The Seller nor any registered agent of Seller has

4

any knowledge of any allegation or claim that the use of the Software by Seller infringes upon, misappropriates, or is in conflict with any intellectual property rights of any third party.  Seller's use of the Software has not infringed, misappropriated or otherwise violated any intellectual property rights of any third party and no infringement, misappropriation or conflict will occur as a result of the continued use of the Software as presently used by Seller or as currently contemplated.

3.9    NO BROKER.    Seller acknowledges and agrees that there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Seller or any of its affiliates or shareholders.

4.    <u>INDEMNIFICATION</u>.

4.1    SURVIVAL.  Notwithstanding anything contained herein to the contrary, the representations and warranties contained herein shall not survive the Closing. Notwithstanding anything contained herein to the contrary, none of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms.

4.2    SELLER'S INDEMNITY.  Intentionally omitted.

4.3    CERTAIN LIMITATIONS.  Intentionally omitted.

5.    <u>CLOSING</u>.

5.1    CLOSING CONDITIONS.  The obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (each or all of which may be waived in writing in whole or in part to the extent permitted by applicable law):

(a)    Seller shall have delivered, or caused to be delivered to Buyer, all items set forth in <u>Section 5.3</u>;

(b)    Buyer shall have delivered, or caused to be delivered to Seller, all items set forth in <u>Section 5.4</u>;

(c)    the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division, Case No. 14-22080-jrs (the "Bankruptcy Court") shall have entered into the Sale Order approving the motion or motions for approval under Section 363 of the Bankruptcy Code of the sale of the Assets and assumption and assignment of the Assumed Contracts and assumption of the Assumed Liabilities pursuant to the terms of this Agreement and the transactions hereunder (the "Approval Motion");

(d)    no court order by the Bankruptcy Court or the applicable United States District Court shall have been entered in any action or proceeding, including, without limitation, Seller's bankruptcy case, instituted by any person that enjoins, restrains, or prohibits the consummation of the transactions contemplated hereby or stays, enjoins or otherwise renders ineffective or materially modified, the Sale Order;

(e)    the Sale Order shall include a finding by the Bankruptcy Court pursuant to Section 363(m) of the Bankruptcy Code, that the negotiations between Buyer and Seller, entering into the transaction contemplated hereby, as approved pursuant to the Approval Motion and in accordance with the Sale Order, have been in all respects conducted and carried out in good faith, therefore shall be subject to all protections afforded by Section 363(m) of the Bankruptcy Code; and

(f)      the form and substance of the Sale Order shall be reasonably satisfactory to Buyer and its legal counsel; and

(g)      Buyer shall have received cash proceeds from a financing transaction in an amount necessary to finance the transactions contemplated by this Agreement, pay related fees and expenses and provide adequate ongoing working capital on terms and conditions satisfactory to Buyer.

5.2      CLOSING.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on a date that is mutually agreed to by the parties following the satisfaction of the conditions to Closing set forth in Section 5.1, including the expiration of any stay period for the Sale Order pursuant to Federal Rule of Bankruptcy Procedure 6004(h), but in any event within 30 days of expiration of any stay period for the Sale Order, (the "Closing Date"), at the offices of Forrest Firm, P.C., 4819 Emperor Boulevard, Suite 400, Durham, North Carolina 27703.  The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

5.3      SELLER DELIVERABLES.  At the Closing, Seller shall deliver to Buyer the following:

(a)      a bill of sale in form and substance satisfactory to Buyer (the "Bill of Sale") and duly executed by Seller, transferring the Assets to Buyer;

(b)      an assignment and assumption agreement in form and substance satisfactory to Buyer (the "Assignment and Assumption Agreement") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Assets and the Assumed Liabilities;

(c)      assignments for Intellectual Property in the form of Exhibit B (trademark assets) and duly executed by Seller, transferring all of Seller's right, title and interest in and to the trademark registrations and applications included in the Assets (to the extent such trademark assets exist);

(d)      an assignment and assumption of lease in form and substance satisfactory to Buyer (the "Assignment and Assumption of Lease") and duly executed by Seller with respect to those leases and executory contracts that Buyer elects to assume;

(e)      non-compete agreements in form and substance satisfactory to Buyer (the "Non-Compete Agreements") and duly executed by the shareholders of Kryosphere prohibiting them from competing with the Business for a period of five years following the Closing and containing other customary restrictive covenants;

(f)      intentionally omitted; and

(g)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

5.4      BUYER DELIVERABLES.  At the Closing, Buyer shall deliver to Seller the following:

(a)      the Purchase Price;

(b)      the Assignment and Assumption Agreement duly executed by Buyer;

(c)      the Assignment and Assumption of Lease duly executed by Buyer with respect to those leases and executory contracts that Buyer elects to assume;

(d)      the Non-Compete Agreements; and

(e)      a waiver of Buyer's unsecured, administrative and other claims against Debtor.

6.      POST-CLOSING COVENANTS.

6.1     FURTHER ASSURANCES. Seller shall not voluntarily undertake any course of action which interferes in any way with the rights obtained by Buyer hereunder or is otherwise inconsistent with the satisfaction of its obligations or agreements set forth in this Agreement. Seller hereby agrees not to contest Buyer's ownership or Buyer's title to the Assets. Seller shall execute, acknowledge and deliver any further assignments, conveyances and other assurances, documents and instruments of transfer, consistent with the terms of this Agreement, which are reasonably requested and prepared by Buyer or its counsel and shall take any other action, consistent with the terms of this Agreement, that may be reasonably requested and prepared by Buyer or its counsel for the purpose of assigning, transferring, granting, conveying, and confirming to Buyer or reducing to its possession, any or all of the Assets.  If Buyer cannot secure Seller's signature for any of the foregoing after reasonable efforts, Seller hereby appoints Buyer as Seller's attorney-in-fact to take all actions Buyer deems reasonably necessary to exercise its rights under this Section 6.1.  Seller's obligations in this Section 6.1 shall survive the Closing Date.  Without limiting the foregoing, if after the Closing Date, Buyer determines in its sole discretion that it wishes to obtain any Excluded Asset, Seller shall use its best efforts to accommodate any such transfer.

6.2     CONFIDENTIALITY. From and after the Closing Date, to the maximum extent permitted by applicable law, all information relating to Buyer and the Business,  and rights related thereto (the "Confidential Information") shall at all times be and remain the sole and exclusive property of Buyer.  At all times after the Closing Date, Seller agrees to retain in strictest confidence, and shall not disclose to third parties or use for its benefit or for the benefit of any third party, any Confidential Information, provided, however, that "Confidential Information" shall not include information which is public knowledge or becomes generally available to the public or a third party other than as a result of a disclosure by Seller without the consent of or not at the direction of Buyer. Seller understands and agrees that Buyer's remedies at law for a breach by Seller of its obligations under this Section 6.2 will be inadequate and that Buyer shall, in the event of any such breach, or threat thereof, be entitled to equitable relief (including without limitation injunctive relief and specific performance) in addition to all other remedies provided under this Agreement or available to Buyer at law. Seller's obligations under this Section 6.2 shall survive the Closing Date.  Buyer acknowledges that Seller may be required to disclose Confidential Information in connection with Seller's bankruptcy case.  In such event, Seller shall provide reasonable notice to Buyer prior to disclosing Confidential Information so that Buyer may make any objection it deems appropriate.

6.3     RESTRICTIVE COVENANTS.  During the Restrictive Period (as defined below), Seller shall not hire or solicit for hire, whether directly or indirectly, any employees, independent contractors, representatives or agents of the Buyer, or customers of the Buyer in connection with any services or products which are similar to, or in competition with, products or services provided by Buyer (or the Business), without Buyer's prior written consent. Seller hereby covenants and agrees that at all times during the Restrictive Period (as defined below), Seller will not, directly or indirectly, through or by any agent, representative or employee, engage in work that would inherently call on Seller to reveal or otherwise use any confidential or proprietary information of Buyer (or the Business).  The term "Restrictive Period" shall mean the period beginning on the Closing Date and ending on the day that is three (3) years after the Closing Date.  Seller agrees that during the Restrictive Period, Seller shall not, (a) directly or indirectly interfere in any manner in the Business or contractual relationships between the Buyer and its clients, customers, vendors, employees, independent contractors, agents or representatives, or (b) influence or attempt to influence any such client, customer, vendor, employee, independent contractor, agent or representative to cease doing business with Buyer. Seller agrees that during the Restrictive Period, it (or any affiliate or subsidiary of Seller) shall not operate in any manner in the Business (whether with or through a third party or otherwise) anywhere in the United States.  Seller covenants and agrees with the Buyer that Seller will not at any time after the Closing Date, disparage, defame, or otherwise damage or assail the reputation, integrity or professionalism of Buyer, and as applicable, its services products, subsidiaries and affiliates, and its respective directors, officers, managers, members, employees, agents, successors and assigns, whether directly or indirectly, in writing or orally (or through any other medium).  Seller hereby expressly acknowledges and agrees that the restrictions contained in this Section 6.3 are reasonable with respect to their duration, and the services subject to the restrictions, and that such restrictions are necessary for the adequate protection of the Buyer and its business.

7

7.    <u>MISCELLANEOUS</u>.

7.1    GOVERNING LAW; VENUE. This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the substantive laws of the State of North Carolina applicable to contracts entered into and to be performed entirely within the State of North Carolina, without giving effect to the principles of conflicts of law thereof. Buyer and Seller further agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to (a) the interpretation and enforcement of this Agreement or any ancillary document and (b) the Assets and the Assumed Liabilities.  Buyer consents to and expressly consents to and agrees not to contest such exclusive jurisdiction; provided, however, that if the Bankruptcy Court refuses to accept jurisdiction over any such dispute, then any state or federal court located in the State of North Carolina shall have jurisdiction over such dispute and Buyer and Seller hereby consent to the jurisdiction of such court in any such case.

7.2    WAIVERS; CUMULATIVE REMEDIES. Any waiver, consent or the like must be in writing. Any waiver by either party of any breach of this Agreement by the other party shall not constitute a waiver of any other or subsequent breach of this Agreement.  All remedies, either under this Agreement or by law or otherwise, afforded to the parties hereunder shall be cumulative and not alternative.

7.3    NOTICES.  All notices and other communications required or permitted hereunder shall be in writing and shall be effective upon receipt by electronic mail with a confirming copy sent by first- class mail, postage prepaid, or five (5) days after deposit in the U.S. postal system by certified or registered mail, return receipt requested, postage prepaid to the addresses set forth above or such other address as a party may designate for itself by providing notice hereunder.  A copy of any notice to Buyer shall also be sent to Buyer's counsel via electronic mail at info@forrestfirm.com.

7.4    ATTORNEYS' FEES. In any action brought to construe or enforce this Agreement, the prevailing party shall receive in addition to any other remedy to which it may be entitled, compensation for all costs incurred in pursuing such action, including, but not limited to, reasonable attorneys' and expert witnesses' fees and costs.

7.5    EXPENSES.  Each party shall bear its own expenses and legal fees incurred on its behalf with respect to this Agreement and the transaction contemplated hereby.

7.6    SEVERABILITY. In case any provision of this Agreement is held to be invalid or unenforceable, such provision shall be deemed amended to the extent required to make it valid and enforceable and such amended provision and the remaining provisions of this Agreement will remain in full force and effect.

7.7    TITLE AND HEADINGS.  The titles and headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

7.8    SUCCESSOR AND ASSIGNS.  The provisions hereof shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.

7.9    RIGHTS OF THIRD PARTIES.  Nothing contained in this Agreement, express or implied, shall be deemed to confer any rights or remedies upon, or obligate any of the parties hereto, to any person or entity.

7.10    ENTIRE AGREEMENT; AMENDMENT. This Agreement, any exhibits hereto and the other documents delivered pursuant hereto constitute the full, exclusive, complete and entire understanding and agreement between the parties with regard to the subject matter hereof and thereof and supersedes and revokes all other previous discussions, understanding and agreements, whether oral or written, between the parties with regard to the subject matter hereof. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the affected party.

8

7.11    COUNTERPARTS; PDF. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  PDF signature pages shall serve as original signature pages.

7.12    DUE DILIGENCE.  The investigations and inquiries made by or on behalf of Buyer and the information, materials and documents supplied to Buyer and/or its advisors in connection with their review of Seller and the Assets/Business were intended to provide Buyer with the comfort necessary for it to enter into this Agreement but shall not (and were not intended to) limit or affect the representations and warranties of Seller or relieve Seller from any of its obligations and liabilities in respect thereof.

7.13    TERMINATION.  This Agreement may, by written notice given on or prior to the Closing Date, be terminated and abandoned at any time prior to the Closing Date:

(a)    by Seller if there has been a material misrepresentation or a material default or breach by Buyer with respect to its representations in this Agreement or the due and timely performance by Buyer of any of the Buyer's covenants and agreements contained in this Agreement, and such misrepresentation, default or breach shall not have been cured within five (5) days after receipt by Buyer of notice specifying particularly such misrepresentation, default or breach;

(b)    by Buyer if there has been a material misrepresentation or a material default or breach by Seller with respect to any of their respective representations in this Agreement or the due and timely performance by the Seller of any of the Seller's covenants and agreements contained in this Agreement, and such misrepresentation, default or breach shall not have been cured within five (5) days after receipt by Sellers of notice specifying particularly such misrepresentation, default or breach; or

(c)    by mutual written agreement of Seller and Buyer.

7.14    BANKRUPTCY COURT APPROVAL.   Notwithstanding anything contained herein to the contrary, Buyer acknowledges that the execution of this Agreement and the consummation of the transactions contemplated herein shall be subject in all respects to the approval of the Bankruptcy Court.

7.15    LENDER.  Notwithstanding anything contained herein to the contrary, Buyer acknowledges that the Assets are subject to a lien held by Renasant Bank, and that the consummation of the transactions contemplated herein shall be subject to the approval of Renasant Bank and/or the cancellation of such lien.

7.16    LEASES AND EXECUTORY CONTRACTS.  No later than 15 days after filing of Seller's motion to approve this Agreement, Buyer shall provide Seller with a list of all leases and executory contracts which Buyer intends to be assigned at closing.

*- Signatures Appear on the Following Page. -*

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed and delivered as of the date first written above.

**SELLER:**

KRYOSPHERE, INC.

By: _____
Name: _____
Title: _____

RPJ LEASING, LLC

By: _____
Name: _____
Title: _____

**BUYER:**

KRYOCAL, LLC

By: _____
Name: Chance White
Title: Partner

## EXHIBIT A

### ASSETS

i.      Furniture, fixtures, equipment, machinery, tools, computer hardware, appliances, vehicles and rolling stock.

ii.     Current assets, including inventories (including raw materials, work-in-progress and finished goods), supplies, prepaid expenses, and advances, but excluding cash and accounts receivable and deposits.

iii.    Current contracts to provide biorepository services, chain-of-custody logistics, clinical trial sample management, and any other service provided in current or past operations of the Business, excluding any contracts with Gilead Sciences, Inc. and affiliated entities.

iv.     Seller's rights, benefits and interests under agreements, leases and licenses that are listed and below: (collectively, "Assumed Contracts"), together with rights, claims and privileges under warranties, representations and guaranties, including agreements with clients, customers, current or former employees (including under noncompetition, nondisclosure and similar agreements), franchisors, licensors, licensees, manufacturers, suppliers and other persons having business relations with Seller:

       (a)      [List of contracts TBD]

v.      Books, files, records, customer lists, sales materials, literature, brochures, computer directories, data bases, correspondence, financial statements, books of account, general ledger, budgets, pro formas, billing records, invoices, billing and collection data and other records, in any medium and however stored; provided, Seller may keep a copy of such records required for tax and accounting purposes.

vi.     Intangible property and rights, including Intellectual Property (as defined in Section 3.8 above), including the Kryosphere, Inc. & RPJ Leasing, LLC names and brands.

vii.    Electronic data and Software (as defined in Section 3.8 above).

viii.   Telephone and fax numbers, directory listings, URLs and web sites.

ix.     Permits and licenses (to the extent transferable).

x.      All goodwill associated with Seller or the Business.

## EXHIBIT B

### TRADEMARK ASSIGNMENT

Kryosphere, Inc. (collectively "Assignor"), a corporation having an address of 422 Emperor Blvd., Ste. 300, Durham, NC 27703, is the owner of the trademarks listed in TABLE I and certain foreign counterparts thereof, the trademarks being presently registered in the United States Patent and Trademark Office as follows:

TABLE I

| Serial No. | Reg. Number | Work Mark |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

KryoCal, LLC ("Assignee"), a North Carolina limited liability company with its principal offices at 2518 Reliance Ave, Apex, NC 27539, desires to acquire all right, title, and interest in the trademarks, the goodwill symbolized and associated with the marks, and the registration of the trademarks, together with the same right, title, and interest into the foreign counterparts, the goodwill symbolized and associated with the foreign counterparts, and the registration of the foreign counterparts. Now, therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, transfer, and set over to Assignee, its successors, and assigns, all right, title, and interest in said marks, along with the registrations together with the goodwill symbolized by the marks, and the registration of the trademarks, and interest into the foreign counterparts, the goodwill symbolized and associated with the foreign trademarks, and the registration of the foreign trademarks.

Assignor warrants that it is the legal owner of all right, title, and interest in the trademarks and foreign counterparts, that the trademarks and foreign counterparts have not been otherwise previously pledged, assigned, or encumbered and that this assignment does not infringe on the rights of any person. Assignor agrees to cooperate with Assignee to carry out any additional documents or other tasks necessary to carry out this assignment, and to execute and deliver all papers, instruments, and assignments as may be necessary to vest all right, title, and interest in and to the aforesaid trademarks and foreign counterparts, including, without limitation, recordation of the assignment in the United States Patent and Trademark Office and any foreign counterparts.

*- Signatures Appear on the Following Page. -*

Executed this _____ day of _____, 2014.

_____

_____

State of      _____
County of    _____

On _____, before me, _____,
          (date)                                    (notary)
personally  appeared, _____, personally known to me or proved to me
on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted,
executed the instrument

**WITNESS my hand and official seal**

_____
(seal)                                    (notary signature)